## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ERIN JONES, )
)
Plaintiff, )
)
v. )       21 C 137
)
CITY OF CHICAGO, )
)
Defendant. )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter is before the Court on Defendant City of Chicago's ("City") Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the reasons that follow, the City's Motion is granted in part and denied in part.

## BACKGROUND

In this employment discrimination case, Plaintiff Erin Jones, a female, alleges she was discriminated against because of her gender and was retaliated against for complaining about the discrimination, both in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.* The City moves for summary judgment on both claims.

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

### *Jones's Employment with the Chicago Police Department*

Jones began working for the Chicago Police Department ("CPD") in 2003 as a police officer. In 2013, Jones applied and was accepted to work in CPD's Narcotics Division, where she remained until she was promoted to detective in July of 2019.

### *The Narcotics Division*

The Narcotics Division is comprised of approximately 6–11 teams made up of 6–10 police officers who all work under the direction of a sergeant and conduct investigations of narcotics crimes, including conducting undercover purchases of narcotics. Depending on the type of investigation the team is working on, for any given undercover narcotics purchase, there may be a "buy officer" who conducts the undercover purchase, as well as officers assigned to conduct surveillance of the purchase, and officers assigned to conduct enforcement and effectuate any arrests necessary. *Id.* The role of officers assigned to conduct surveillance and enforcement on a narcotics purchase is, in large part, to ensure the safety of the officer conducting the purchase. Generally, the supervising sergeant's role is to monitor the radio and coordinate the entire operation to ensure success and officer safety.

There is a general preference that all officers get experience making undercover narcotics purchases; however, which officer is designated to attempt to make a purchase depends on the investigation being conducted and the needs arising therefrom, including

whether a specific officer was running the investigation and had established contacts or a relationship with a target or informant. At different times in the investigations, sometimes the teams would attempt to make undercover narcotics purchases daily, whereas other times it would be less frequently. Additionally, the sergeant supervising the team has discretion to assign officers to roles that they deem best effectuate an investigation. Making undercover narcotics purchases is a dangerous and stressful assignment, though other assignments can also come with their own elevated risks in what is inherently dangerous work as police officers.

### *Jones's History in the Narcotics Division*

From 2013–2017, while working in the Narcotics Division, Jones was assigned to four different teams for varying amounts of time. Her first team was an afternoon team, which she was on for four months before moving to a day team where Jones made undercover narcotics purchases with increasing frequency, beginning with a few times per month, then three to four times per month, and more frequently thereafter. After a year and a half, Jones was asked by a sergeant to move to a third team, where she made undercover narcotics purchases weekly. After about two years, Jones moved to Unit 189, which was originally supervised by a different sergeant but began being supervised by Sergeant Brian Topczewski on or about June 18, 2017. Prior to Topczewski taking over Unit 189, Jones was conducting undercover narcotics purchases a couple times per month.

### *Supervision by Topczewski*

Jones did not know Topczewski prior to him becoming the supervising sergeant of Unit 189. When asked in her deposition whether she thought Topczewski wanted to see the team be successful, Jones answered, "of course." Dkt. # 33, ¶ 11. However, Jones did not believe Topczewski had knowledge of the job he was supposed to be doing as the supervising sergeant, and in the beginning would tell him how the team did things. But Jones found Topczewski to be stupid and "extremely incompetent," which she felt he compensated for by bullying. *Id.*

Jones was the only female on Topczewski's team.[1] Beginning in July of 2017, Jones began noticing that she was shouldering the larger workload of conducting the undercover narcotics purchases and doing unnecessary paperwork. According to CPD records and Jones's own notes, Topczewski's team conducted 12–14[2] undercover officer buys between June 27, 2017, and September 7, 2017. Jones was the "buy officer" for each undercover officer buy listed. Jones admits she was a logical choice for seven of these buys due to her specific role in the investigation but claims that it would have been just as appropriate for other officers on the team to conduct those buys

---

[1] Defendant objects to this fact, citing the deposition of Ronald Mero, who testified that Officer Tiffany Rodriguez was also on the team with Jones. However, both Topczewski and another officer in Unit 189 testified Jones was the only female on the team. Dkt. # 28-4, at 33; Dkt. # 34-3, at 15. Jones's testimony clarifies that Rodriguez was not under Topczewski's direct supervision, but she was part of a team Topczewski sometimes had to supervise. Dkt. # 28-2, at 152–53.

[2] The CPD records show 12 undercover officer buys between June 27 and August 24. Dkt. # 34-6. Jones's handwritten notes include two additional buys that are not listed in CPD's records: one on August 22 and one on September 7. Dkt. # 34-7.

as well as the other buys Jones conducted.  This claim, however, is supported only by Jones's deposition testimony and declaration.

According to Topczewski, when he first became the team's sergeant, the team undertook an operation involving a female target called "Moe," with whom Jones had developed a friendly relationship and as a result was having the most success in purchasing narcotics in an undercover capacity.[3]  It is unclear how many of the undercover buys Jones conducted were related in some way to "Moe."

Jones testified that Topczewski routinely excluded her from conversations with male team members and would not communicate the plans for the day to Jones; instead, he would take the male officers aside and whisper the plans to them.  When there were plans to meet with other narcotics teams, Topczewski would not tell Jones about the meeting—she would have to find out from the other team members.  Jones also testified that Topczewski would be dismissive whenever she tried to speak among the group of officers on the team.  Topczewski "would waive his hand and laugh and roll his eyes and look at another male team member and just, you know, shake his head like it was a big joke that [Jones] would try to contribute anything."  Dkt. # 39, ¶ 14.  Jones also testified that Topczewski would start calling and texting her when she was running only

---

[3] Jones denies the team was undertaking an investigation involving "Moe," but cites no evidence to refute Topczewski's claim.  Accordingly, this fact is deemed admitted.  *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (". . . the nonmovant must cite specific evidentiary materials justifying the denial.  If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation.").

five minutes late to work and berate her once she arrived, yet he did not do the same to the other male officers on the team on occasions when they arrived even later.

Jones also complained Topczewski would ignore her when she tried to contact him over the radio but would respond right away when male officers called. When Jones would not be able to reach Topczewski on the radio to make a decision with regards to an operation, however, other officers on the team would either be able to get in touch with him or the team members made the necessary decision without his involvement.

On one instance at the beginning of August 2017, during which Jones's team and another team were assisting an F.B.I. task force, Topczewski refused Jones's request to pair up with another female officer. When she asked him why he refused, Topczewski told her that it was "not safe" for two women to be together in the same car, although when pressed further he could not offer any reason why two women working together would be unsafe. Jones felt humiliated and embarrassed by the incident.

Although she claims it became "very hard," Jones was able to perform her work with the team, and would "burn time," meaning using earned overtime hours when Topczewski's belittling and dismissive behavior became too much.

Jones also personally observed Topczewski excluding two male officers on the team from conversations: Officers Mark Diaz and Ronald Mero, both Hispanic. In addition to feeling like she was always the officer sent out to make the undercover drug purchases, on a handful of occasions Jones felt she and Diaz were tasked by

Topczewski with processing voluminous paperwork required after the team had effectuated a search warrant. If the workload exceeded 40 hours per week, though, Jones received overtime pay.

At different points in time, Officers Diaz and Mero decided to transfer off Topczewski's team. Diaz testified that he felt he was being mistreated by Topczewski, including being given unnecessary paperwork to do. Mero testified he requested a transfer reassignment in part because he felt like Topczewski was disrespectful towards him. Mero also felt that Topczewski's directions placed him in his role as an enforcement officer (and all of his teammates) in danger.

Topczewski stated that he often made determinations as to which officers on the teams were going to be partnered together for targeted missions based on the operational needs of the mission, his judgement of what would best effectuate the mission, and the interest of the officers' safety. If a request to partner two undercover officers on the team might have attracted negative attention and undermined the mission or the team's safety, Topczewski would deny it and designate an alternative pairing that better blended the team into the surroundings for purposes of the mission. Jones denies these decisions were actually based on these criteria.

Jones complained to Topczewski approximately three times that she felt he was putting her at risk, and specifically complained that he needed to be out and responsive on the radio when she was conducting undercover purchases. In response to each complaint, Topczewski would roll his eyes, get frustrated, and walk away. The first

time Jones complained to Topczewski was approximately three or four weeks after he became her supervisor, on or about July 26, 2017, and the last time was a few weeks later, on or about August 11, 2017.

After Jones complained to Topczewski the third time, reiterating that he needed to pay attention, be responsive on the radio, and not be on his phone, Topczewski gave the same dismissive response, causing Jones to become visibly upset and walk out of the office he was in. She did not hear Topczewski say anything else; however, the next day Diaz told Jones that after she left the office Topczewski was in, Topczewski allegedly pointed towards her direction and said something to the effect of, "that's why women don't belong on the job." Dkt. # 33, ¶ 19.

A few days later, on or about August 15, 2017, Jones brought her safety concerns and other complaints to Carlos Mostek, a lieutenant assigned to narcotics, complaining about her workload, that Topczewski was conducting operations in an unsafe manner, and about the comment Topczewski had made about women. Mostek recalled Jones saying something to the effect of, "I don't think he likes women." Dkt. # 33, ¶ 20. Mostek raised Jones's concerns about Topczewski's leadership deficiencies to then-Commander of the Narcotics Division, Ronald Kimble, and also spoke with Topczewski. Mostek recalls speaking with another one of Topczewski's team members, Officer Mike Palladino, who confirmed that on one occasion the team was not able to raise Topczewski on the radio because he was not paying attention, but also stated that the team had enough personnel and lookouts that he felt comfortable on the operations.

8

In speaking with Topczewski about Jones's concerns, Mostek re-enforced rules about conducting undercover purchases within the unit, including minimum staffing, who is responsible for what, as well as his own responsibilities as the sergeant, to which Topczewski responded in a positive manner. Mostek did not ask about Jones's concerns that Topczewski did not like women because he "didn't feel that had anything to do with him conducting narcotics operations in an unsafe manner." Dkt. # 39, ¶ 20.

Jones states that after she complained to Topczewski, he became more dismissive of her, and more frequently would not inform her of the team's plans. Similarly, after complaining to Mostek, things only got worse. Jones's primary concern was Topczewski's perceived disregard for her safety.

On September 13, Jones complained directly to Commander Kimble because she felt her previous complaints to Topczewski and Mostek were being ignored. Jones told Kimble about her past complaints and that she felt there was a "complete lack of regard for [her] safety." Dkt. # 39, ¶ 24. Jones also brought Kimble some of Topczewski's 2015 Facebook posts.[4] Jones told Kimble she did not want to be removed from the team because they were in the middle of an investigation, and she did not want the stigma attached to being reassigned. Kimble made copies of the

---

[4] These Facebook posts consist of several off-color "memes" consisting of derogatory language towards women, minorities, and certain religions, all posted in 2015—two years before Jones met Topczewski. Jones was not "friends" with Topczewski on Facebook. Jones testified that she searched for and viewed Topczewski's posts after another officer told her she should look at them.

Facebook posts and said he needed time to think about it. That evening, Kimble telephoned Jones and told her that she should meet with him the following day.

Kimble acknowledged that Jones complained to him as indicated above but decided that he was not going to initiate a formal investigation. Kimble testified that he felt there was no need for an investigation because "that was [Jones's] opinion and Topczewski was the captain of his team and ran his team as he saw fit." Dkt. # 39, ¶ 27.

### *Complaints to the BIA*

On or about September 14, 2017, Lieutenant Michael Ryle informed Jones that she was being moved to another team within the Narcotics Division and that he would be initiating a formal complaint against Topczewski with CPD's Bureau of Internal Affairs ("BIA"). The day after the internal complaint was initiated against Topczewski for his actions towards Jones and his 2015 Facebook posts, Topczewski initiated a complaint against Jones based on a team text message group in which Jones referred to the team as a "sinking ship." Dkt. # 33, ¶ 26. Topczewski's complaint was administratively closed, meaning the allegations did not merit conducting a full investigation.

Jones's complaint against Topczewski included allegations that he referred to another team in the unit as a "team of color" in a derogatory manner, stated "women don't belong on the job," and that he unfairly made Jones conduct the majority of the undercover buys and made posts to Facebook that were negative towards women. She

10

later added an allegation that Topczewski filed the complaint against her in retaliation for her initiating the complaint against him.  On April 10, 2019, the BIA sustained one allegation[5] against Topczewski relating to the old Facebook posts and recommended Topczewski be suspended for fifteen days.

Based on its investigation of Jones's allegations, on or about October 7, 2018, the BIA sustained two allegations against Topczewski: his comment about it not being safe for two female officers to partner together and the comment about "women on the job," and recommended a three-day suspension.  In its summary report of Jones's allegation relating to this incident, the BIA concluded the allegations did not rise to the level of discrimination but found Topczewski's statements "lacked etiquette."  The BIA did not sustain the allegation that Topczewski discriminated against Jones by making her conduct most of the undercover buys for the team.  Rather, the BIA determined Jones's frequent assignments as "buy" officer were based on the success she was having and the operational needs of the team, not because of her sex.

### Jones's Move to a New Team and Subsequent Work History

Commander Kimble made the decision to move Jones to another team, her fifth team, within the Narcotics Division on or around September 17, 2017.  Kimble stated he routinely moved officers to a new team when there was conflict between the officer and their supervising sergeant, regardless of the officers' or the sergeants' gender.  With

---

[5] The BIA did not sustain the allegation that Topczewski used the phrase "team of color" in a derogatory manner or the subsequently added allegation that Topczewski allegedly filed a complaint against her in retaliation for her initiating the complaint against him.

respect to Jones, Kimble testified that he chose to move Jones because of "concerns" that Jones was "unhappy with the way her team was being [run] and how she was treated" and "other concerns." Dkt. #28-4, at 10–11.

Only Kimble had the ability to transfer officers or sergeants from different teams within the Narcotics Divisions; even lieutenants would need his approval to do so. Topczewski did not ask for Jones to be moved from Unit 189 and Jones admits she has no personal knowledge of whether Topczewski spoke to anyone to have her moved to another team.

Jones's new team was on the same floor, but different office space, and she was paid the same salary and assigned to the same shift. Because the new team already had established investigations ongoing, Jones fulfilled more of the administrative duties, like preparing search warrants, writing complaints, and helping prepare inventories. She felt that her new sergeant treated her well. Jones received overtime pay on the new team, but not to the same extent as when she was running her own investigations on Topczewski's team.

Jones was on the new team for approximately seven weeks before, due to her pregnancy, she requested and was granted a desk assignment within the Narcotics Division on or about November 12, 2017. After returning from her leave of absence from the birth of her child, on or about September 16, 2018, Jones was assigned to a different team, where she remained until she was promoted to detective in July of 2019.

In July of 2019, Jones was promoted to become a detective, the position she continues to hold today. Jones admits that no one interfered with her promotion to becoming a detective in July of 2019. Additionally, since becoming a detective, Jones has not tried to move or applied for any other promotions.

Based on the above, Jones brought Title VII claims against the City for sex discrimination and retaliation. The City now moves for summary judgment on all claims.

With respect to the Title VII sex discrimination claim, the City argues that Jones's claim fails because none of the alleged incidents Jones complains of amount to adverse employment actions. The City further contends any hostile work environment claim fails because Jones was not subjected to harassment based on any protected category, she was not subjected to severe or pervasive harassment, and there is no basis to hold the City liable. Additionally, the City says the undisputed evidence shows that Topczewski treated male officers on the team the same way he treated Jones, and Jones does not offer any evidence of a comparator that would support her claim for discrimination. The City also asserts that Jones cannot demonstrate that her treatment was pretextual because the undisputed evidence shows that Jones's assignments were based on the operational needs of her assigned team, and the stray comments are insufficient to establish discriminatory animus.

As to Jones's Title VII retaliation claim, the City argues this claim also fails because, like her discrimination claim, none of the alleged incidents about which Jones

complains amount to materially adverse employment actions. The City also contends that Jones cannot show a causal connection between her complaint of discrimination and her reassignment because moving an officer who had a conflict with his or her team's sergeant was routine, regardless of the officer's or sergeant's sex.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific

14

facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (cleaned up). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. And the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper

15

denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

As detailed above, the City moves for summary judgment on all claims. We address each claim in turn.

### I. Title VII Sex Discrimination

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions[,] or privileges of employment, because of such individual's . . . sex." 42 U.S.C. 2000e–2(a)(1). The determinative question in discrimination cases is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's sex caused the adverse employment action. *Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The question is whether the totality of the evidence shows discrimination, eschewing any framework or formula. *Ortiz*, 834 F.3d at 765.

16

In this case, the parties opted to proceed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This approach requires Jones to make a *prima facie* case of discrimination, and if she does so, the burden shifts to the City to offer a nondiscriminatory reason for the adverse employment action. If the City does so, the burden then shifts back to Jones to show that the City's stated reason was pretext.

### A. Prima Facie Case of Discrimination

To establish a *prima facie* case of sex discrimination, Jones must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *Igasaki*, 988 F.3d at 958 (quoting *Ortiz*, 834 F.3d at 765). Only the third and fourth elements are disputed in this case.

#### 1. Materially Adverse Employment Action

The City first takes issue with Jones's claimed adverse employment actions. Adverse employment action "has been defined quite broadly in this circuit." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). The Seventh Circuit has recognized that it is "impossible" to create a "precise list of activities that constitute adverse employment actions," and whether an act is adverse depends on the "unique circumstances of individual cases." *Id.* Nevertheless, an adverse employment action must be "materially adverse, 'meaning more than a mere inconvenience or an alteration of job

responsibilities.'" *Id.* (citing *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002)); *see also Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) ("not everything that makes an employee unhappy is an actionable adverse action"); *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (materially adverse employment action is one where the plaintiff suffers "a significant change in employment status."). Some examples of adverse employment actions include: termination or suspension, demotion evidenced by a decrease in wage or salary, denial of a raise or fringe benefits, less distinguishable title, material loss of benefits, significantly reduced material responsibilities, and unbearable changes in job conditions such as a hostile work environment. *Atanus*, 520 F.3d at 677; *see also Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (grouping adverse employment actions into three categories).

In arguing she was subjected to adverse employment actions, Jones claims she had a heavier workload and more paperwork than the rest of her team, and her safety was unreasonably endangered because she was made to do all the undercover officer buys. Jones also points to Topczewski's increasingly dismissive behavior towards her, his comment that "that's why women don't belong on the job," his refusal to allow her to partner with another female on one occasion, and the way he would berate her when she was five minutes late to work when he did not do the same to the male officers when they were even later to arrive. She additionally argues Topczewski's 2015 Facebook posts are evidence of his animus towards women, and further claims she lost overtime pay when she was transferred to a different team.

The Court agrees with the City that none of the complained of actions qualify as materially adverse employment actions. For example, absent some evidence that discrimination motivated work distribution, harder work assignments generally do not constitute adverse employment actions. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007). Jones has not come forth with evidence that supports her claim that Topczewski's perceived distaste for women was the motivating factor behind assigning Jones to the undercover officer buys, rather than consideration of the operational needs of the team in each case. *Good v. Univ. of Chi. Med. Ctr., Inc.*, 673 F.3d 670, 675 (7th Cir. 2012) ("guesswork and speculation are not enough to avoid summary judgment"). Jones admits she was a logical choice for at least seven of the twelve undercover buys. And Jones's speculation that it would have been just as appropriate for other members of the team to conduct some of the undercover buys she was ordered to conduct, without more, is not enough to support a discrimination claim. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

Furthermore, some of the males on the team were subjected to some of the same treatment by Topczewski that Jones complains about. Jones personally observed Topczewski excluding Officers Diaz and Mero from conversations, and on one

occasion, she and Diaz were tasked with voluminous paperwork when the rest of the team was permitted to go home.

As for the eye-rolling and dismissive behavior, "Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'" *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (citing *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005)). And a single instance in which Jones was denied her requested partner is not materially adverse. *See*, *e.g.*, *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 384 (7th Cir. 2020). While Jones may have perceived this to be unfair and even embarrassing, this one-time slight is not actionable under Title VII. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 462 (7th Cir. 2014) ("Title VII does not protect employees from poor managers or unpleasant and unfair employers."). "Personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under Title VII . . . getting a 'cold shoulder' from your boss easily falls within this non-actionable category." *Brown*, 700 F.3d at 1107 (cleaned up). Similarly, Topczewski's comments that "that's why women shouldn't be on the job" and that it's "not safe" for two women to partner together, while distasteful and inappropriate (especially coming from a supervisor), are not adverse employment actions.

Jones's reassignment to a new team is a closer call. However, in the Court's view, Jones has not come forward with sufficient evidence to create a question of material fact as to whether the reassignment was a materially adverse action. "[A]

20

transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another." *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004). And "[a] reassignment of job duties is not materially adverse unless it is a significant change that is often reflected by a corresponding change in work hours, compensation, or career prospects." *Robertson*, 949 F.3d at 384 (cleaned up).

Jones was transferred to a new team within the Narcotics Division after bringing her complaints to Commander Kimble. On the new team, Jones's pay remained the same and she was assigned to the same shift. Because the new team already had established investigations ongoing, however, Jones fulfilled more of the administrative duties. Jones felt that her new sergeant treated her well. She received overtime on the new team, but not to the same extent as when she was running her own investigations on Topczewski's team. Jones's primary complaint with the reassignment appears to be the claimed loss of overtime.

The loss of opportunity to work overtime can amount to an adverse employment action. *Lewis*, 496 F.3d at 654. In this case, however, it does not. Jones has not come forth with any evidence that she would have made significantly more overtime had she remained on Topczewski's team until requesting her desk assignment. *See Galvan v. Cmty. Unit Sch. Dist. No. # 300*, 46 F. Supp. 3d 836, 841 (N.D. Ill. 2014) ("Lost overtime is a materially adverse employment action only if the plaintiff shows that the overtime was a 'significant and recurring part of an employee's total earnings similar

21

to a raise,' but not if the overtime opportunities were 'sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer' and thus akin to a 'discretionary bonus.'") (quoting *Lewis*, 496 F.3d at 653–54). Jones admits that the opportunity for overtime depended on the nature of the investigation. Because of this, overtime pay was unpredictable and discretionary.

Additionally, while Jones alleges there is a stigma attached to being "dumped" from a team, Jones does not allege that her career prospects were damaged as a result of the reassignment. In fact, Jones was promoted to detective in July of 2019, and Jones admits no one interfered with her promotion. Additionally, since becoming a detective, Jones has not tried to move or applied for any other promotions. The reassignment to a new team does not constitute a materially adverse action in the context of Jones's sex discrimination claim.

### a. Hostile Work Environment

Perhaps recognizing the weakness of her individual complaints, Jones urges the Court to consider the cumulative effect of the various complained of actions, rather than consider them individually. When considered cumulatively, Jones says, the complained of conduct more than sufficiently establishes Jones was subjected to a hostile work environment based on her sex. The Court disagrees.

A hostile work environment qualifies as a materially adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (holding that materially adverse employment actions include "cases of harassment-mistreatment of

22

an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee") (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–88 (1998)). But "[s]urviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920.

In addressing whether a work environment is hostile, the Court must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* In so doing, the Court must bear in mind that Title VII does not impose a "general civility code" in the workplace and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (cleaned up); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438–39 (7th Cir. 2004). Rather, a hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mendenhall v.*

23

*Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). "This is a demanding standard; a plaintiff's evidence must go well beyond showing rudeness or incivility . . . , even if it need not reach the point of 'hellishness.'" *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 973 F.3d 718, 728 (7th Cir. 2020).

Here, Jones argues she was made to do all of the undercover buys in an unreasonably dangerous manner, and this was because Topczewski did not like women. Topczewski was also pervasively dismissive of Jones. He would harass her for being five minutes late when the male team members would arrive even later and suffer no consequence, and she could not partner with another female on one occasion.

Taken together, Jones's complaints do not amount to "harassment [that is] so severe or pervasive that it alters the conditions of [Jones's] employment." *Thompson v. Mem. Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010); *see, e.g., Patton v. Ind. Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) (claims that supervisor was rude, abrupt and arrogant, ignored employee's suggestions, and failed to inform employee about changes at work did not establish hostile work environment); *see also Abrego v. Wilkie*, 907 F.3d 1004, 1015-16 (7th Cir. 2018) (affirming summary judgment on hostile work environment claim despite evidence that the plaintiff's "supervisors were short-tempered, hostile, unfairly critical, and disrespectful"); *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012) (the plaintiff was subject to sporadic inappropriate and rude comments by her supervisors, but offhand comments, isolated incidents, and

simple teasing do not rise to the level of conduct that alters the terms and conditions of employment); *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a supervisor . . . fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.").

While Topczewski's two comments about women and general attitude towards Jones would undoubtedly be viewed by many as unprofessional and disrespectful, "Title VII does not recognize a cause of action for having a bad boss." *Wilson v. Hispanic Hous. Dev. Corp.*, 2021 U.S. Dist. LEXIS 96043, at *27 (N.D. Ill. 2021). No reasonable jury could conclude that Topczewski's conduct unreasonably interfered with Jones's work or created an abusive working environment for Jones. The Court does not doubt Jones's claims that she was unhappy in her job, but Jones has failed to demonstrate a triable issue of fact as to whether she suffered a materially adverse employment action.

## B. Cumulative Assessment of the Evidence

Setting aside the *McDonnell Douglas* paradigm and assessing the evidence holistically, the Court has no trouble concluding Jones has failed to demonstrate the existence of a genuine issue of material fact that would preclude summary judgment on her Title VII sex discrimination claim.

Jones argues Topczewski's two remarks about women and his 2015 Facebook posts are direct evidence of discrimination. Indeed, these comments and some of the Facebook posts can be objectively described as derogatory towards women (as well as

certain races and religions). But Jones has come forth with no evidence from which a reasonable jury could conclude that Topczewski's conduct in ordering Jones to conduct all of the undercover officer buys or having her do more paperwork than most of the team on a few occasions was directly tied to any sort of discriminatory animus. The record reflects Jones was an appropriate choice for at least seven of the buys, she was having success in conducting the buys, and the decision to have Jones conduct the buys was based on the operational needs of the team at the time.

Jones complains Topczewski ordering her to conduct all of the undercover officer buys combined with his lack of responsiveness and supervision during the buys put her in increased danger. This may be true, but Jones was not the only officer who complained that Topczewski's actions were putting the team in danger. Aside from the two comments about women, Jones's complaints largely pertain to Topczewski's juvenile and unprofessional behavior and poor management style. This is not enough to trigger Title VII liability or survive summary judgment. The City's motion for summary judgment is therefore granted as to Jones's Title VII sex discrimination and hostile work environment claims.

## II. Title VII Retaliation

To succeed on her Title VII retaliation claim, Jones must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) her employer took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. *Robertson*, 949 F.3d at 378.

26

Jones alleges she was retaliated against for complaining of sex discrimination by being transferred to a different team within the Narcotics Division and having a complaint initiated against her by Topczewski. The parties agree that Jones engaged in a protected activity. The first question, then, is whether Jones's reassignment and Topczewski's complaint against her constitute materially adverse employment actions.

The standard for a materially adverse employment action is lower in the retaliation context than in the discrimination context. *Little v. Illinois Dep't of Pub. Health*, 2020 WL 1530736, at *15 (N.D. Ill. 2020). In the retaliation context, an employment action is materially adverse if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Each case is judged "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. at 71 (cleaned up).

Topczewski's initiation of the complaint against Jones was not a materially adverse action. The complaint was administratively closed, did not result in any tangible job consequence, and is not in Jones's disciplinary history. *See Lucas v. Brennan*, 2020 WL 127768, at *7 (N.D. Ill. 2020) (the plaintiff's claims that being subjected to an investigative interview, issued a "letter of warning" and "letters of concern" which did not result in tangible job consequences did not rise to the level of retaliatory or discriminatory adverse actions).

27

However, while Jones's reassignment did not rise to the level of materially adverse in the context of Jones's sex discrimination claim, we do believe a reasonable jury could conclude that it clears the lower bar for Jones's retaliation claim. Being "dumped" from a team while in the middle of an investigation and reassigned to a team that results in a significant amount of administrative drudgery instead of running one's own investigations and fewer opportunities for overtime pay could arguably deter a reasonable employee of complaining of discrimination.

Assuming without deciding that the reassignment constituted a materially adverse employment action, Jones must still show a but-for causal connection between her protected activity and the reassignment. The City argues Jones cannot show a causal connection because Kimble "routinely moved officers to a different team when there was conflict between the officer and the team's sergeant—regardless of sex." Dkt. # 27, at 26. This may be true, but the "conflict" in this case included complaints of gender discrimination. A reasonable jury could conclude Jones was reassigned because she engaged in a protected activity.

The motion for summary judgment is denied as to Jones's Title VII retaliation claim.

## **CONCLUSION**

For the foregoing reasons, the City's Motion for Summary Judgment is granted with respect to Jones's Title VII sex discrimination and hostile work environment

claims and denied with respect to Jones's Title VII retaliation claims. Status is set for

6/6/2023 at 11:00 a.m.

It is so ordered.

Dated: May 16, 2023

Charles P. Kocoras
United States District Judge